## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**AMANDA HESS,**

**Plaintiff,**

    **v.**

**VILLAGE OF BETHEL,
OHIO, et al.,**

**Defendants.**

**Case No. 1:22-cv-56**

**JUDGE DOUGLAS R. COLE**

## <u>OPINION AND ORDER</u>

The events of this case began with Plaintiff Amanda Hess's teenaged son burning a mattress in the backyard of her home in violation of a Village of Bethel ordinance. They ended with Village of Bethel Chief of Police John Steven Teague barging into Hess's house and tasing and arresting her. Hess responded by suing Teague and the Village of Bethel for violating her Fourth Amendment rights. (Compl., Doc. 1). Both defendants now seek summary judgment. Teague invokes qualified immunity, (Doc. 25), and the Village of Bethel disclaims liability for Teague's actions, (Doc. 24). The Court holds that while Teague is entitled to qualified immunity, a jury could nonetheless conclude both that he violated the Constitution and that the Village of Bethel is liable for that violation. Accordingly, the Court **GRANTS** Teague's Motion for Summary Judgment (Doc. 25) and **GRANTS IN PART** and **DENIES IN PART** the Village of Bethel's Motion for Summary Judgment (Doc. 24).

# BACKGROUND

## A.    The Incident

On March 25, 2020, Hess's son, Dylan, started burning a mattress and perhaps some other trash in the backyard of the family residence. (Hess Dep., Doc. 21, #114–15). Around 4 p.m., an off-duty firefighter, Jared Shouse, came to the property and asked Hess to instruct her children to extinguish the fire. (*Id.* at #117–18). Hess says she told her children to do so, but also demanded that the firefighter leave her property. (*Id.* at #118, 122). And to her credit, at some point after that exchange (the timing is unclear), it appears that Hess's sons ran a water hose out to the firepit to douse the flames. (*Id.* at #168–69).

Shortly after the firefighter spoke with Hess, Teague, who was the Chief of Police for the Village of Bethel at that time, also arrived at the scene. (*Id.* at #119–20). Exactly what transpired after he arrived depends to some extent upon whom you ask. According to Hess, upon Teague's arrival, one of Hess's sons told Hess that the police were there. That prompted her to open the front door. (*Id.* at #120). As she opened the door, her dog ran out on to the porch. (*Id.*). Hess went out on to the porch to retrieve her dog and drag it back inside. (*Id.*). Meanwhile, Teague came up to the porch and put his foot in the doorway, which prevented Hess from shutting the door. (*Id.* at #120–21).

At that point, Hess testifies that Teague asked her to produce some form of identification. (*Id.* at #123). Hess refused to identify herself or provide any information. (*Id.*). Instead, Hess demanded that Teague leave her property. (*Id.*). And Hess maintains that until the moment when Teague stuck his foot in the doorway,

2

he had neither asked for her identification nor attempted to arrest her. (*Id.* at #123, 125, 177).

Teague tells a somewhat different tale. According to Teague, he received a call from dispatch about a possible explosion in the area and was told that an off-duty firefighter was on the scene. (Teague Dep., Doc. 22, #229). Teague knew the address well, as he had been there several times before for medical emergencies and welfare checks for an elderly couple who previously owned the property. (*Id.* at #232). Teague drove to the area and saw a large black smoke cloud. (*Id.* at #230). He parked his vehicle near the edge of the property and saw the fire burning behind the house. (*Id.* at #234). When he arrived, Shouse (the off-duty firefighter) warned Teague that a female at the scene was being uncooperative. (*Id.* at #230).

Teague walked with Shouse towards the residence. (*Id.* at #234–35). As they approached the driveway, Teague testified that Hess came out of her house or from her backyard (he is not sure which) yelling obscenities and demanding they get off her property. (*Id.* at #235–36). Teague claims he tried to converse with Hess while she screamed at him. (*Id.* at #236). Hess repeatedly shouted that her daughter had coronavirus and that she was contagious and insisted that Teague leave the property. (*Id.*). According to Teague, while they were still in the driveway, Teague demanded she provide a form of identification, at least partially because he did not recognize her as the owner of the property. (*Id.* at #235–39). He also needed her identification so he could issue a citation for the open burn on the property. (*Id.* at #238). Teague kept trying to explain to Hess that an open burn was illegal but, according to Teague,

3

he "could not get a word in edgewise." (*Id.*). At some point, Hess took the dogs and her children inside the house. (*Id.* at #240–41). While she headed for the house, Teague followed her to the porch, still demanding her identification, and telling her he was going to issue her a citation for the open burn. (*Id.* at #242, 246–47). He stated that at that point he had "already made the decision that she was going to receive a citation for the crimes that she had committed that day, and she was basically not free to go." (*Id.* at #242–43). Teague then put his foot in the doorway because, in his mind, "she was not free to leave at that time." (*Id.* at #245). However, Teague concedes he had not arrested her at that time. (*Id.*). Nor at his deposition could he recall ever telling Hess that she was not free to go. (*Id.* at #270–71).

Whatever events led to Teague placing his foot in the doorway to block Hess from closing the door, the rest of the encounter is largely captured by a video that Hess's son recorded. The video begins with Teague demanding that Hess produce identification while he is standing in the doorway. For her part, Hess is yelling at Teague to "get off her property." As she begins to shut the door, Teague yells, "if you shut that on my foot, I'm going to come in there and arrest your behind!"  Hess responds, "you're not allowed to come in my house right now!" to which Teague replies, "I absolutely am." Hess's son (who is standing behind his mother while recording the exchange) then tells Teague to "go get a warrant." Teague claims "I don't have to have a warrant." Hess and Teague continue to yell at each other, with Hess commanding Teague to get off her property and Teague demanding that Hess produce identification.

Hess then turns to her son and says, "call him," prompting her son (who is holding the camera) to walk into the kitchen and to tell his sister to "call Rick" (Hess's long-time friend who was living with the family at the time, (Hess Dep., Doc. 21, #84–85)). As the camera pans away (because Hess's son walks into the kitchen), Hess can be heard telling Teague to call the health department because the house was under quarantine.

A few seconds later, Hess can be heard screaming "get off me!" At that moment, the camera pans back towards the living room and captures Teague (who by this point had entered the living room) grabbing Hess's arm. Hess struggles with Teague and throws her arm up to free herself from his grip. She tries to turn away and pushes a chair out of the way to clear her path. While tugging at Hess's arm, Teague pulls out his taser and fires. Hess falls to the ground. Teague yells for Hess to put her hands behind her back. Once she complies, Teague cuffs Hess. A few moments later Teague radios for assistance, another officer enters the house, and they both help Hess off the floor and escort her to a police cruiser.

At no point during the video could Teague be heard telling Hess that she was under arrest. At his deposition, Teague admitted that he could not hear himself on the video tell Hess she was under arrest. (Teague Dep., Doc. 22, #301–02). But Teague claims that he did tell Hess she was under arrest while he was in the doorway. (*Id.* at #321–22). Hess, however, maintains that when she initially retreated further into her house that Teague was *not* trying to arrest her. (Hess Dep., Doc. 21, #125–26).

5

After taking Hess into custody, Teague subsequently told the mayor that he had tased her, and he prepared an incident report recounting many of the events described above. (Teague Dep., Doc. 22, #287; *See* Doc. 22-1, #360–66). In that incident report, Teague recounted that he placed his foot in Hess's doorway, "asked her again to produce her ID or I was going to arrest her." (Doc. 22-1, #364). Teague then recounted that Hess attempted to shut the door on his foot and that he "told her if she tried to shut my foot in the door one more time that it was not going to end well for her." (*Id.*). Teague records that "she again tried to shut my foot in the door. At that time I decided to place her under arrest." (*Id.*). Teague completed the report on March 26, 2020. (*Id.* at #366). And in his capacity as Chief of Police, Teague approved his own report a few days later on March 29, 2020. (*Id.*; Teague Dep., Doc. 22, #297–99).

**B.    Village of Bethel Police Department Manual**

Before Teague assumed his role as Chief of Police, the then-Chief of Police, the Mayor, the Sergeant (who at that time happened to be Teague), and the Village of Bethel legal counsel worked on switching over the Bethel Police Department Manual from paper to digital format. (Teague Dep., Doc. 22, #221). The group discussed the paper manual section by section, made edits and changes, and finalized the manual. (*Id.* at #221–24). Other than the edits and changes the group made, the manual was written and published by a third-party company—Lexipol. (*Id.* at #224–25). After Teague became the Chief of Police, Lexipol would send proposed updates to the policy

manual. (*Id.* at #225). Teague would then unilaterally approve those changes to the policy manual and send the updated policy to Bethel police officers. (*Id.* at #225–26).

## C. Procedural History

In response to the events described above, Hess sued both Teague (in his individual and official capacities) and the Village of Bethel. (Doc. 1). She asserts two claims under 42 U.S.C. § 1983: (1) a Fourth Amendment claim challenging Teague's warrantless entry into Hess's private residence, and (2) a Fourth Amendment claim challenging Teague's allegedly excessive use of force against Hess. (*Id.* at #6–14).

Both defendants have now moved for summary judgment. (Docs. 24, 25). The Village of Bethel argues that it is not liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), because Hess has pointed to no policy or custom that caused her injury. (Doc. 24, #429). Teague argues that he did not violate Hess's Fourth Amendment rights or, in the alternative, that he is entitled to qualified immunity because the specific constitutional rights at issue (either as to the entry and arrest or the level of force used) were not clearly established at the time of the incident. (Doc. 25, #452–64). Hess responded to both motions, (Docs. 28, 29), and Defendants replied, (Docs. 32, 34). The motions are ripe for review.[1]

---

[1] In its Motion for Summary Judgment, the Village of Bethel references an expert report created by Scott Hughes, the chief of police of the Hamilton Township Police Department in Warren County, Ohio. (Doc. 24, #435, 438–40 (citing Doc. 23-1)). Hess objects to the Village of Bethel's reliance on the Hughes report arguing that the report is not proper under the Federal Rules of Evidence. (Mtn. to Strike, Doc. 30; Doc. 35 (recharacterizing motion to strike as an evidentiary objection)). The Court agrees. The report begins by recounting in narrative form the incident on March 25 from Teague's perspective. (Doc. 23-1, #406–08). It then purports (1) to explain and to recast facts that are clearly recorded in the video submitted to the Court, (*id.* at #408–15 (describing Hess in the video as "belligerent and defiant" and showing frame by frame screenshots of the video to conclude that Hess was "actively

7

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a "genuine issue" of material fact exists, the Court views the evidence in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). However, when video evidence depicts material facts "so clearly that a reasonable jury could view those facts in only one way," the Court views those facts "in the light depicted by the video." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

When the non-movant (Hess) bears the burden of proof at trial, as is true with regard to Defendants' motions for summary judgment, the movants (Teague and the Village of Bethel) can establish that there are no genuine disputes of material fact and that they are entitled to judgment as a matter of law by showing that the non-moving party (Hess) lacks evidence to support an essential element of her

---

resisting")); (2) to articulate standards governing an officer's reasonable use of force, (*id.* at #410–11); and (3) to conclude, as a matter of expert opinion, that the officer's intervention is "fully legal," that Teague's use of force was proportional, and that his conduct was "objectively reasonable," (*id.* at #416–17). The report also includes inflammatory and irrelevant facts about a crime Hess committed *after the incident*. (*Id.* at #419). This is not an appropriate expert report. Its recasting of the facts depicted in the video do not "help the trier of fact to understand the evidence," Fed. R. Evid. 702(a), its discussion of Hess's post-incident criminal conduct is prejudicial and irrelevant, Fed. R. Evid. 403, and its legal conclusions invade the province of this Court to determine what the law is, *see Berry v. City of Detroit*, 25 F.3d 1342, 1353–54 (6th Cir. 1994). Hess's objection, (Doc. 30), is **SUSTAINED**, and the Court **STRIKES** the affidavit and report, (Doc. 23-1).

case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993).

## LAW AND ANALYSIS

42 U.S.C. § 1983 provides a cause of action against state officials for constitutional violations. That provision states,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured … .

*Id.* Hess asserts two § 1983 claims against both Teague and the Village of Bethel: (1) an unlawful entry claim, and (2) an excessive force claim. Both claims allege that both defendants violated the Fourth Amendment.

The Court begins with the individual-capacity claims against Teague.

## A.    Teague

In Teague's Motion for Summary Judgment, he asserts the defense of qualified immunity. (Doc. 25, #452). Qualified immunity shields a state official from individual-capacity liability when he "perform[s] [his] duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To overcome this defense, a plaintiff must show that (1) the official violated the plaintiff's constitutional rights, and (2) the right was "clearly established" when the violation occurred. *Reed v. Campbell Cnty.*, 80 F.4th 734, 742 (6th Cir. 2023). In assessing this defense, the Court is free to take those two questions in either order. *Pearson*, 555 U.S. at 236. As to the latter question, a right is clearly established when "every reasonable official would have understood that what he is

doing violates that right." *Reed*, 80 F.4th at 742 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (cleaned up). To show that "every reasonable official" would have known whether his conduct violates the Constitution, a plaintiff need not point to a prior case with a similar factual pattern. *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005). But existing precedent must have placed the "constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

When assessing the scope of a constitutional question for the purposes of qualified immunity, federal courts usually may not frame the legal question at a "high level of generality." *Rhodes v. Michigan*, 10 F.4th 665, 679 (6th Cir. 2021) (quoting *al-Kidd*, 563 U.S. at 742). That is because "general proposition[s]" of law are "of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742. That said, general propositions of law are not "inherently incapable of giving fair and clear warning." *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002) (citation omitted). Instances can and do arise in which a "general constitutional rule" applies with "obvious clarity" even to a "novel factual circumstance." *Id.* at 741–45 (cleaned up) (holding that prior cases which generally discussed a laundry list of inhumane punishments—including handcuffing inmates to fences for a prolonged period—clearly prohibited using a hitching post as punishment because the cruelty was "obvious"); *Williams v. Morgan*, 652 F. App'x 365, 375 (6th Cir. 2016) (citing *Norton v. Stille*, 526 F. App'x 509, 513–14 (6th Cir. 2013)) (holding that *Norton*'s generally prohibiting "gratuitous violence" against pretrial detainees applied to school officer's breaking a thirteen-year-old student's

arm because the school officer's conduct was "so gratuitous" that he was "on notice" that it was unlawful (cleaned up)).

Just as federal courts may not rely on overly general statements of law to deny qualified immunity, they also may not rely on isolated, nonbinding statements of law. Generally, only controlling authority, such as Supreme Court precedent, published Sixth Circuit precedent, or precedent from the highest court of the relevant state, clearly establishes a proposition of law for the purposes of qualified immunity. *Finley v. Huss*, 102 F.4th 789, 808 (6th Cir. 2024); *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988). Only when there is a "robust consensus" of persuasive authority may a federal court rely on such authority to find that legal rules are clearly established. *Finley*, 102 F.4th at 808.

### 1.    Unlawful Entry Claim

#### a.  A Jury Could Conclude Teague's Entry into Hess's Home Violated the Fourth Amendment

Hess claims that Teague's entry into her home violated the Fourth Amendment. The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall be violated … ." U.S. Const. amend IV. "At its core, the Fourth Amendment protects the right of an individual to retreat into his own home and there be free from unreasonable governmental intrusion." *Reed*, 80 F.4th at 742 (cleaned up). To protect this right, Fourth Amendment law presumes that any search and seizure within a home, if executed without authorization by a warrant, is presumptively unreasonable and, by extension, unlawful. *See id.*

11

This presumption may be overcome when the officer executes the search or seizure pursuant to an established exception to the warrant requirement. The umbrella exception that Teague invokes—the "exigent circumstances" exception— excuses an officer's warrantless search or seizure when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (cleaned up). But when claiming that "exigent circumstances" excused the officer's failure to obtain a warrant, it is up to the officer to prove that an exigency arose. *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010). This burden is "heavy," and it is made only heavier when the warrantless entry stems from the officer's response to a misdemeanor or minor crime. *Id.*; *Smith v. Stoneburner*, 716 F.3d 926, 931 (6th Cir. 2013); *see Lange*, 141 S. Ct. at 2020–22.

The Supreme Court has recognized several categories of exigent circumstances which qualify as "compelling" for Fourth Amendment purposes: (1) rendering emergency assistance to an occupant (often called the caretaking exception); (2) protecting the officer or others from harm; (3) preventing the imminent destruction of evidence; and (4) preventing the suspect's escape (often called the hot-pursuit exception). *See Lange*, 141 S. Ct. at 2017.

Under the hot-pursuit exception, an officer who has attempted to arrest an individual in a public place may chase that individual if she flees into a private home. *See Stoneburner*, 716 F.3d at 931. For the purposes of the hot-pursuit exception to the warrant requirement, an individual's doorway is a "public place" so long as that

12

individual is "exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *United States v. Santana*, 427 U.S. 38, 42 (1976).

But even if an officer attempts to arrest an individual in a public place, the individual's subsequent flight into a private home does not *categorically* justify warrantless entry into that home. For the exception to apply, the individual's flight must cause an "emergency … situation" that creates the need for "immediate police action." *Coffey v. Carroll*, 933 F.3d 577, 586 (6th Cir. 2019) (cleaned up). In a sense, the government is required to demonstrate that it has a compelling interest in proceeding immediately without awaiting a warrant. Situations that may qualify as an emergency necessitating "immediate police action" include: (1) when the suspect is violent, *see United States v. Bass*, 315 F.3d 561, 564 (6th Cir. 2002) (emergency present when suspect opened fire on others in an apartment complex); (2) when the officers reasonably fear the suspect will destroy evidence, *Santana*, 427 U.S. at 42–43 (holding that police needed to act quickly because they had a "realistic expectation" that the suspect would destroy evidence); and (3) when the suspect's flight may prevent the police from ultimately capturing him, *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967) (holding that the speedy search of a residence for a suspected bank robber was necessary to prevent his escape); *see also United States v. Franklin,* No. 5:11-cr-42, 2011 WL 5827605, at *4–*6 (E.D. Ky. Aug. 31, 2011) (concluding that pursuit of a suspected carjacker into a private backyard was necessary to prevent escape), *report and recommendation adopted by* 2011 WL 5827600 (E.D. Ky. Nov. 18,

2011). And when such circumstances are *not* present, the Sixth Circuit has repeatedly found that the hot-pursuit exception does not apply. *Stoneburner*, 716 F.3d at 931–32 (holding that no emergency necessitated "immediate police action" because suspect was neither armed nor violent); *United States v. Corder*, 724 F. App'x 394, 403 (6th Cir. 2018) (finding no emergency because officer was arresting a suspect for a non-violent misdemeanor that "lacked any destructible evidence"); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994) (finding no emergency existed because officers had surrounded the house and the suspect could not flee the scene).

A careful reader may notice that two of the three types of emergencies that make a pursuit "hot" overlap with the categories of exigent circumstances that, on their own, justify warrantless entry. One may wonder, then, what independent work the hot-pursuit exception performs as a type of "exigent circumstance."

The rationale for the hot-pursuit exception is unique in two ways. First, it takes into account that a suspect's flight alone often increases the likelihood that another emergency will soon occur. *Lange*, 141 S. Ct. at 2021 (stating that a suspect's flight changes the "calculus" of determining whether an exigency exists because flight often "creates a need for police to act swiftly"); *see Santana*, 427 U.S. at 43 ("Once Santana saw the police [and fled], there was likewise a realistic expectation that any delay would result in destruction of evidence."). Second, the hot-pursuit exception recognizes that the government's interest in apprehending suspected criminals is itself compelling in certain circumstances. *Lange*, 141 S. Ct. at 2021 ("[F]light may show a willingness to flee yet again, while the police await a warrant."); *see United*

14

*States v. Morgan*, 743 F.2d 1158, 1162 (6th Cir. 1984) ("[T]he 'hot pursuit' exception is reserved for situations where speed is essential to protect a compelling governmental interest.").

But in assessing whether the government has a compelling interest that allows reliance on the exigent circumstances exception (of which hot pursuit is a subcategory), another principle comes into play. Specifically, the Supreme Court has held that the strength of the government's interest (e.g., in apprehending a suspect or preventing the destruction of evidence) is only as compelling as the underlying crime is serious. In *Welsh v. Wisconsin*, Mr. Welsh, the defendant, was spotted driving erratically before veering his car into an open field. 466 U.S. 740, 742 (1984). A bystander pulled over to help Welsh and asked another passerby to call the police. *Id.* When Welsh asked the bystander for a ride home, the bystander advised Welsh to wait for the police. *Id.* Welsh chose instead simply to walk home—a short distance away. *Id.* When the police arrived at the scene, the bystander said that Welsh appeared inebriated. *Id.* The police proceeded to Welsh's home and knocked on the door. *Id.* at 743. When Welsh's stepdaughter answered the door, the police entered the home, proceeded upstairs, and arrested Welsh for driving while intoxicated. *Id.* The State eventually filed a criminal complaint against Welsh for the same, which prompted Welsh to move to dismiss the complaint on the ground that his arrest violated the Fourth Amendment. *Id.* at 746–47.

The *Welsh* Court held that exigent circumstances did not justify the police officers' warrantless arrest of Welsh in his home. The Supreme Court wrote, "when

15

the government's interest is only to arrest for a minor offense, the presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant." *Id.* at 750 (cleaned up). The Supreme Court then held that "the gravity of the underlying offense" is an important factor to consider when determining whether an exigency exists. *Id.* at 753. Applying that factor to Welsh's case, the Court held that hot pursuit did not apply because the police did not continuously pursue Welsh from the crime scene. *Id.* But more importantly for the current case, the *Welsh* Court stated that even the potential deterioration of evidence—a recognized category of exigent circumstance that presumedly applied to Welsh's diminishing-over-time blood-alcohol level—did not justify the warrantless entry because Welsh was suspected of only a noncriminal, civil offense. *Id.* at 753–54. The upshot of *Welsh* is that an officer's warrantless entry into an individual's home is not justified by exigent circumstances simply because the officer can formulaically point to a recognized category of exigency that may apply. Rather, the warrantless entry must be justified by a *true* emergency considering the facts of the case before the court, including the nature of the underlying offense.

In applying these rules here, the Court starts by observing that all agree Teague did not have a warrant to enter the home. That means that his entry was presumptively unreasonable and that it is incumbent upon him to prove that an exigent circumstance justified his entry. On the record here, especially when viewing the facts in the light most favorable to Hess, Teague has not met that burden. The underlying crime was minor at best (more on that below), and the Court cannot say

as a matter of law that any exigency existed (especially given how difficult it is to show such an exigency when dealing with a minor crime). Thus the Court cannot grant Teague summary judgment on the Fourth Amendment claim.

Teague urges a different result, principally relying on the hot-pursuit exception to justify his warrantless entry. He argues that because he "began his encounter" with Hess in the "street" and demanded identification to cite her for the open burn, and because she "retreated into the doorway" in an attempt to flee into the house, his entry into Hess's home categorically did not violate the Fourth Amendment. (Doc. 25, #458–60). In pressing this argument, Teague does not clearly state whether his alleged "pursuit" began when he told Hess he would issue a citation for the open burn or when he told Hess she was under arrest. (*See id.* at #459). But ultimately it does not matter either way. Because, even assuming Hess was standing in a "public place"[2] when Teague tried to arrest her, and even assuming her retreat

---

[2] While the Court assumes this legal premise for the purposes of Teague's motion, the Court takes this opportunity to note that the contention that the open doorway of a person's residence is "public" for Fourth Amendment purposes is troubling. Admittedly, *United States v. Santana* requires this conclusion. 427 U.S. at 42 ("[I]t is nonetheless clear that … Santana was in a 'public' place. She was not in an area where she had any expectation of privacy."). But *Santana*'s doorway-is-public holding seems difficult to reconcile with more recent Supreme Court precedent. *Florida v. Jardines*, for example, unequivocally holds that the curtilage, the "area immediately surrounding and associated with the home" is also "*part of the home itself* for Fourth Amendment purposes." 569 U.S. 1, 6 (2013) (emphasis added) (cleaned up). And *Jardines*'s statement about the curtilage was not some stray comment with no relevant application to the situation here. The *Jardines* Court held that the curtilage was the home to affirm the quashing of a warrant based on an officer's use of a dog to sniff at the defendant's *front door*. *Id.* at 3–5. And when faced with the State's argument that the defendant had no "reasonable expectation of privacy" in odors emanating from his front door, the Court further justified its curtilage-based holding by stating that the reasonable-expectation-of-privacy test had been "added to, not substituted for, the traditional property-based understanding of the Fourth Amendment." *Id.* at 11 (cleaned up). That is the same traditional property-based understanding, by the way, that *Santana* rejected as inapplicable. 427 U.S. at 42. On the whole, *Jardines* seems to undercut *Santana*'s logic as to why an open

into her home constituted "flight," no emergency justified entering Hess's home without a warrant.

For example, Hess was not violent in any way, and Teague's pure conjecture that she might become violent does not change that fact. Teague pushes back, arguing that when Hess retreated into her home, Teague did not know whether she planned to get a weapon and that his lack of knowledge on this point thus justified the warrantless search. (Doc. 25, #451). Not so. The Fourth Amendment does not allow the police merely to presume, with no other basis, that an individual *might* be retrieving a weapon and therefore *might* pose a danger to the officer simply because that individual tried to retreat into her home. The Sixth Circuit has said as much: holding that "evidence that firearms are within a residence, by itself, is not sufficient to create an exigency." *Barton v. Martin*, 949 F.3d 938, 948 (6th Cir. 2020) (cleaned up). Rather, the officer must possess information suggesting that the individual was armed and "likely to use a weapon or become violent." *Id.* (citation omitted). Here, Teague offers no such information. In short, he has proffered no evidence showing Hess was "likely to use a weapon or become violent." *Id.* (citation omitted).

Nor does it appear to the Court that there was any "realistic expectation" that Hess would destroy evidence. *Santana*, 427 U.S. at 43. Although Teague argues that

residential doorway constitutes a "public place." And with good reason. One would have a difficult time arguing with a straight face that the word "house," the plural form of which appears in the text of the Fourth Amendment itself, does not include the literal doorway of one's house. But until the Supreme Court overrules its own precedent, it is not the prerogative of this Court to ignore a perhaps questionable but yet on-point case. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023). So the Court assumes that Hess was in a "public place" when Teague first began the attempted arrest, whether that was in her driveway or her doorway.

Hess "could have destroyed evidence of the open burn" if she had been allowed to retreat into her home, he does not explain *why* he believed she would do so or even *how* she could accomplish that. (Doc. 25, #460). A large open burn of a mattress *in the backyard* is not the type of offense easy to hide by retreating *into the home*. Moreover, the violation was plain to see. Teague could have simply gone to Hess's backyard and taken pictures of the open burn which is in fact what law enforcement did. (*See* Doc. 27-1 (pictures of the open burn taken by law enforcement)).

And Teague could not have reasonably feared that Hess was trying to escape. Teague maintains that he needed to arrest Hess immediately because he was not sure the residence was hers or that she would be there to cite for the open burn later. (Doc. 25, #459). True, Teague had been to the same property within a year before the incident here, and it was owned at that time by an elderly couple. (*Id.*; Teague Dep., Doc. 22, #232–33). But Teague had ample reason to believe that Hess owned the property when he arrived at the residence on March 25, 2020. For starters, Hess told Teague that the residence was her property—several times. She even told him to call the health department to confirm that the household was under quarantine because her daughter had coronavirus. Teague was also there in the first place only because Hess's son was burning a mattress in the backyard—an activity unlikely to have been performed by a trespasser. Hess's several children and dog were also there, which would lead any reasonable person to believe that it was her residence. Teague himself admitted during his deposition that when he arrived at the doorway that he noticed the furniture was different. (Teague Dep., Doc. 22, #243–44). And on top of that,

Teague's deposition reveals that even as he doubted that Hess owned the residence, he never suspected she was a trespasser—at most, he suspected that she might have been family to the previous owners. (*Id.* at #243). But on those facts, whether Teague believed that Hess was the true owner of the property or not, any such concern did not create an emergency justifying entering the home without a warrant. Indeed, he could have merely left an officer positioned on the street while he sought a warrant. It is difficult to imagine the entire family successfully fleeing before a warrant issued. Thus Teague's subjective belief that Hess may not have owned the residence, standing alone, does not meet the "heavy burden" the Constitution requires to excuse a warrantless entry. *Johnson*, 617 F.3d at 868.

Lastly, and most importantly, the original offense that triggered all of this was not just minor—it wasn't even a crime. Under Ohio law, an open burn is a civil violation, not a misdemeanor. *See* Ohio Admin. Code § 3745-19-06; Ohio Rev. Code § 3737.51. And in this case, it was a civil violation that could easily be remedied without an arrest. Before Teague even arrived at the scene, an off-duty firefighter had asked Hess to instruct her children to extinguish the fire. And Hess claims she did so (which for present purposes, the Court must credit as true). Given that either the firefighter or Hess's children were addressing the open burn, the only possible governmental interest Teague could have in arresting Hess was to issue her a citation for the offense.

True, Hess also attempted to obstruct official business by refusing to give Teague identification. (Doc. 28-1, #504 (Hess pleaded guilty to that offense)). And in

fairness to Teague, that charge is a misdemeanor under Ohio law. Ohio Rev. Code §§ 2921.31, 2923.02. Still, under the circumstances, any exigency created by that later offense seems intertwined with—and necessarily stems from—the need to address the underlying open-burn violation—which in this case was minor. The importance of that underlying interest, even if heightened by Hess's non-compliance with Teague's lawful request for identification, does not trump the importance of Hess's right to be secure *in her own home* from governmental intrusion absent a warrant.[3]

Indeed, the offense here, whether the open burn or Hess's failure to provide identification while standing in her own doorway, was, in the Court's view, even less serious than the offense in *Welsh*. And this Court is bound to heed *Welsh's* warning that "it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor." 466 U.S. at 753. Even entertaining the remote possibility that Hess could have somehow destroyed evidence of the open burn and evaded a ticket, that

---

[3] While Hess's right to be secure in her home retains its force notwithstanding her refusal to identify herself, nothing in this Opinion and Order should be read as condoning her behavior. Hess escalated the situation (as did Teague). At least on Shouse's and Teague's telling, she approached both officials, who initially were responding only to the fire, in a belligerent manner—refusing to identify herself despite a lawful order to do so and yelling obscenities. And even if she did not approach them, the video reveals she was acting belligerently when Teague was at the door. Had she simply identified herself and been issued a citation, that quite likely would have been the end of the interaction. Civil discourse, even (or perhaps especially) among those who strongly disagree, is an important and worthwhile objective. That said, the Constitution constrains government officials even when interacting with belligerent people.

would not have presented an emergency sufficient to excuse the Fourth Amendment's warrant requirement.

The "sanctity of a person's living space" is not an insignificant interest for the Court (or police) to lightly disregard. *Lange*, 141 S. Ct. at 2018. It is a freedom enshrined in the Constitution with "ancient and durable roots." *Jardines*, 569 U.S. at 6. And this case strikes at the heart of that age-old freedom, for it is the "physical entry of the home [that] is the chief evil against which the … Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 586 (1980) (citation omitted). On the record here, the Court cannot conclude as a matter of law that Teague's entry into Hess's home and her arrest therein complied with the Constitution.[4] Thus he is not entitled to summary judgment on that ground.

### b. Hess's Right Against Teague's Warrantless Entry of Her Home Was Not Clearly Established

That Teague does not prevail on his argument that he did not violate Hess's Fourth Amendment rights, though, does not end the matter. Unless Hess can show that "every reasonable official" in Teague's shoes would have understood that he was violating the Constitution, Teague is entitled to qualified immunity. *al-Kidd*, 563 U.S. at 741 (cleaned up). To be clear, showing this does not require Hess to point to a prior case with a similar factual pattern. *Cummings*, 418 F.3d at 687. But she must identify precedent that placed the right at issue beyond debate—or, in other words, that

---

[4] The Court notes that the situation would be entirely different if these events had played out in their entirety in a public place. But, as noted, it would be an understatement to characterize as merely 'well settled' the proposition that a person's residence has special significance for Fourth Amendment purposes. *See, e.g., Payton*, 445 U.S. at 586.

Teague was on notice that his conduct was unlawful. *al-Kidd*, 563 U.S. at 741; *Hope*, 536 U.S. at 739.

That presents a problem for Hess. While the Court believes that some case law supports the conclusion that Teague's actions violated the Fourth Amendment, it cannot say that the question is beyond debate. True, as described above, both *Smith v. Stoneburner* and *United States v. Corder* seem to require a police officer to show the existence of a standalone emergency when executing an arrest in an individual's home even when that arrest began outside the residence. *Stoneburner*, 716 F.3d at 931–32 (holding pursuit was not hot because the suspect "was not armed, … was not violent[,] … [and] had committed no other, more serious, crimes"); *Corder*, 724 F. App'x at 402–03 (holding that no emergency was present when the suspect committed only a "non-violent misdemeanor that lacked any destructible physical evidence"). And if those were the only cases on the subject, they would establish that Teague's conduct violated the Fourth Amendment clearly enough to warrant denying him qualified immunity. But at least one controlling[5] case points the opposite way.

In *Middletown v. Flinchum*, a man recklessly drove his car through an intersection spinning out his tires and "causing the car to fishtail as [he] made a right turn." 765 N.E.2d 330, 331 (Ohio 2002). Police officers followed the man in their

---

[5] The Court uses the term "controlling" not in the sense that the Ohio Supreme Court's decisions are binding as a precedential matter on *this* Court, but rather that they constitute precedent on which Ohio police officers can reasonably rely as authoritative on federal constitutional matters—that is until the United States Supreme Court reverses or abrogates those decisions. *Cf. Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1988) ("In order to be clearly established, a question must be decided either by the highest state court in the state where the case arose, by a United States Court of Appeals, or by the Supreme Court.").

cruiser, but when he noticed, he sped away in his vehicle. *Id.* Eventually, the officers found the vehicle parked, and the man standing next to it. *Id.* As soon as the man saw the police, he bolted towards the rear of his house. *Id.* When he started fleeing, officers exited their vehicles yelling for the man to stop. *Id.* They chased the man *into his home* and arrested him. *Id.* The government charged the man with reckless operation, DUI, and resisting arrest. *Id.* The Ohio Supreme Court held that the officer's arrest, including the warrantless entry into his house, did not violate the Fourth Amendment. *Id.* According to that court, "when officers, having identified themselves, are in hot pursuit of a suspect who flees to a house in order to avoid arrest, the police may enter without a warrant, regardless of whether the offense for which the suspect is being arrested is a misdemeanor." *Id.* at 332. The Ohio Supreme Court held that its holding was necessary to dispel "the illusion that flight from police officers is justified and reasonable as long as no felony offense has been committed." *Id.*

As applicable here, *Flinchum*, although admittedly with little analysis, appears to have adopted a categorical rule allowing officers to chase a misdemeanor suspect into his home to effectuate an arrest—seemingly without regard to whether any other emergency justified the entry and arrest. That is, the *Flinchum* court did not justify the warrantless entry there by reference to anything in particular about the crime or the pursuit, other than that it was a continuous pursuit that began in a public place when officers attempted to arrest a defendant for a misdemeanor they saw him commit. In light of *Flinchum*'s holding, this Court cannot find that every

reasonable police officer in Teague's position (in this case, a position governed by Ohio Supreme Court caselaw just as much as caselaw from the Sixth Circuit) would have known that entering Hess's home to complete an arrest that began with pursuit in her open doorway (a "public place" under *Santana*) for a misdemeanor that he observed (her failure to provide the identification he lawfully requested) violated the Fourth Amendment.

But the Court stresses that Teague's immunity from liability in this case stems not from uncertainty in the law, but from fortuitous timing. The law was uncertain in March 2020 only because *Lange v. California*, a United States Supreme Court case decided one year later, had not yet abrogated *Flinchum's* holding. *See Lange*, 141 S. Ct. at 2017 n.1, 2020–22 (citing *Flinchum* as representative of the categorical rule permitting warrantless pursuit of misdemeanants into their homes and rejecting that rule).

Had the events of this case happened just fifteen months later, the Court would have no trouble holding that the rights Teague violated were clearly established. But as things stand, the Court concludes that Teague is entitled to qualified immunity on Hess's unlawful entry claim.

### 2. Excessive Force Claim

Hess's excessive force claim against Teague is much easier to resolve. Because the Court holds that, viewing the record in the light most favorable to Hess, Teague's entry into Hess's home was unlawful (even if not indisputably unlawful), it follows that Teague's arrest of Hess likewise was unlawful. *Cf. Hayward v. Cleveland Clinic*

25

*Found.*, 759 F.3d 601, 613–14 (6th Cir. 2014) (holding that plaintiff's unlawful entry claim was *Heck* barred because success on that claim would necessarily "render his arrest unlawful" and thereby collaterally challenge the validity of his guilty plea for resisting arrest). And as a matter of elementary logic, to the extent that Hess's arrest was unlawful, any force that Teague used to effectuate that arrest was also unlawful.

That said, the Sixth Circuit has held that, where an individual challenges an officer's use of force during an arrest on the grounds that the underlying arrest is unlawful, that claim is "subsumed in the illegal stop or arrest" and "is not a discrete excessive force claim." *Gray v. Shelby Cnty.*, Nos. 22-5542/5543/5544, 2023 WL 5237373, at *6 (6th Cir. Aug. 15, 2023) (adopting the standard from *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1331 (11th Cir. 2006)). Instead, in such cases, the force used during the arrest is an aspect of the damages suffered because of the unlawful arrest, and that is so even if such force on its own were inadequate to support a separate claim.[6] *Bashir*, 445 F.3d at 1332.

But that should not be understood to mean a plaintiff may *never* maintain an excessive force claim in addition to an unlawful arrest claim. *Gray* stands for the simple proposition that force used to carry out an unlawful arrest does not per se establish an excessive force claim. 2023 WL 5237373, at *6. To maintain a discrete excessive force claim that is not duplicative of damages for an unlawful arrest, *Gray*

---

[6] As noted above, the individual-capacity unlawful arrest claim against Teague fails on qualified immunity grounds, so Hess has no unlawful arrest claim against him giving rise to a right to damages. But as discussed below, the Court holds that the Village of Bethel itself may be liable on a *Monell* theory for Hess's unlawful arrest, and any harm caused by Teague's force presumably would be relevant to the damages associated with that claim.

instructs courts to "analyze the excessive force claim without regard to whether the arrest itself was justified." *Id.* (citation omitted). If, assuming the arrest was justified,[7] the "manner in which [the] arrest was carried out" was objectively unreasonable, the officer may be liable under a separate excessive force claim. *Id.* (quoting *Bashir*, 445 F.3d at 1332).

But here, under *Gray's* framework, Hess's excessive force claim is a nonstarter. That is because an officer's use of a taser on an individual is per se not excessive when the arrestee is actively resisting arrest. *Rudlaff v. Gillispie*, 791 F.3d 638. 641 (6th Cir. 2015). Here, the video evidence unequivocally depicts that Hess was "physically struggling with" Teague, which constitutes resisting arrest for purposes of this rule. *Id.* (citation omitted). Putting aside questions as to the lawfulness of her arrest, Teague's use of force was reasonable and did not independently violate the Fourth Amendment.

## B.    Village of Bethel

Separately from Teague, the Village of Bethel moves for summary judgment on the claims against it[8] as a governmental entity. (Doc. 24). A local governmental

---

[7] This assumption is doubly applicable in this case where the Court holds that Teague had insufficient notice that his arrest of Hess was unlawful. Whether framed as a background assumption of the discrete excessive force claim at the constitutional violation prong or as a consideration at the clearly established prong, the effect is the same: the Court must assume Teague's arrest of Hess was lawful to determine his liability for any force he used during that arrest.

[8] Technically, the Village of Bethel's motion also applies to the claims asserted against Teague in his official capacity, as those claims are but "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citation omitted).

unit, unlike a sovereign State, qualifies as a "person" under 42 U.S.C. § 1983. *Monell*, 436 U.S. at 690. As a result, it can be held liable for depriving an individual of her constitutional rights under color of law.[9] That said, § 1983 subjects a local government to civil liability for only its *own* actions, not the actions of its employees as such. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121–22 (1988). Of course, as a governmental entity and not a natural person, a local government can act only through its agents. The Court's job, then, is to discern when an employee's actions are merely his own versus when they should be treated as that acts of the local government itself.

A plaintiff may show that a government official's actions are attributable to the governmental entity in four ways: (1) by showing the actions were undertaken pursuant to an official policy or enacted legislation of the entity; (2) by showing that a policymaker for the entity authorized the actions (either beforehand or via ratification after the fact); (3) by showing the actions were a result of the entity's failure to train the official; or (4) by showing the actions formed part of a custom of the entity's acquiescence to similar actions. *See Novak v. City of Parma*, 33 F.4th 296, 309 (6th Cir. 2022). Only the second avenue is relevant here.

---

[9] Moreover, the Court's holding that Teague is entitled to qualified immunity does not change whether the Village of Bethel is liable for *its* actions. *See Everson v. Leis*, 556 F.3d 484, 493 n.3 (6th Cir. 2009) ("A government entity cannot claim any personal immunities, such as … qualified immunity. The only immunities that can be claimed … are forms of sovereign immunity that the entity, qua entity, may possess." (cleaned up)); *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 369 (2001) ("[T]he Eleventh Amendment does not extend its immunity to units of local government."); *Fletcher v. Town of Clinton*, 196 F.3d 41, 55–56 (1st Cir. 1999) (reversing district court for conflating qualified immunity and *Monell* liability and stating that "it is not impossible for a municipality to be held liable for the actions of lower-level officers who are themselves entitled to qualified immunity" (citation omitted)).

28

To make out a viable *Monell* claim under the policymaker avenue, a plaintiff must show: (1) the official who undertook the action was a policymaker or final decisionmaker for the entity; (2) the official acted within his sphere of authority; and (3) the official's actions caused plaintiff's injuries. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–84 (1986); *Novak*, 33 F.4th at 309. A government official is a policymaker for § 1983 purposes when his decisions about a particular subject matter are final and unreviewable or when he has the authority to establish broad policy goals for the governmental entity. *Tlapanco v. Elges*, 969 F.3d 638, 658 (6th Cir. 2020). And whether an official's authority meets those criteria is a question of state law. *Praprotnik*, 485 U.S. at 124–26. As part of that state-law inquiry, federal courts may not assume that "policymaking authority lies somewhere other than where the applicable law purports to put it." *Id.* at 126. Lastly, an official acts within his sphere of authority when he is "responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483–84.

If a plaintiff establishes all three requirements—that is, she shows that an official, "whose acts or edicts may fairly be said to represent official policy," acted on behalf of the local government and injured her by those acts—she may recover damages against the local government even for a single decision by that government policymaker. *Id.* at 480 (cleaned up).

Here, there is sufficient evidence from which a jury could find facts supporting the Village of Bethel's liability. First, state law suggests Teague was a policymaker for the Village of Bethel with respect to traditional law enforcement functions. Ohio

29

law provides that a village chief of police is "the peace officer of [the] village and the executive head, under the mayor, of the police force." Ohio Rev. Code § 737.18. The chief of police "has exclusive authority over the stationing and transfer of all deputies, officers, and employees within the police department" and is tasked with "arrest[ing] any person in the act of committing an offense against the laws of the state or the ordinances of the village." *Id.* § 737.19(A), (C). Moreover, the chief of police is not removable at will by the mayor. Rather, the mayor must file charges against the chief of police for cause and the legislative authority of the village (in this case the Village Council) must hold a hearing and decide whether to dismiss the charges, suspend the chief of police, or remove him from office. *Id.* § 737.171. Ohio law granted Teague broad authority over the Village of Bethel police department, tasked him with enforcing the law, and insulated him from removal by the mayor. That structure renders his law enforcement decisions effectively final and unreviewable. *Culberson v. Doan*, 125 F. Supp. 2d 252, 275–76 (S.D. Ohio 2000) (holding that a village chief of police was policymaker under Ohio law with respect to ordering a criminal investigation of an individual).

The facts on the ground seemingly further confirm his authority. Although the former Chief of Police enlisted the help of the mayor, the sergeant, and outside legal counsel when overhauling the police manual, Teague, in his capacity as Chief of Police, unilaterally approved updates to that manual. True, Lexipol, a third-party company, drafted the police manual. But the existence of a third-party initial drafter does not affect whether Teague was a policymaker under state law, as the Village of

30

Bethel erroneously implies in its brief. (Doc. 24, #432). Teague exercised final authority over the ratification of the manual. (Doc. 22, #225–26). Nor does the former Chief of Police's consulting the mayor and outside legal counsel when overhauling the police manual make a difference either. Seeking advice in the execution of one's duties does not demonstrate a lack of authority—just as giving advice does not demonstrate the existence of authority. *Cf. Novak*, 33 F.4th at 309 (municipal law director's advice that police had probable cause to obtain a warrant did not show policymaking authority over police actions). If Teague truly required the mayor's consent to change the policy manual, he would not have unilaterally approved updates sent by Lexipol after taking office.

Second, a jury could conclude that Teague was acting within his sphere of authority when he arrested Hess. Teague performed a traditional law enforcement function. He was acting within the ambit of his general duty to "arrest any person in the act of committing an offense." Ohio Rev. Code § 737.19(C). Hence, he had authority with "respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. Lastly, Teague's actions self-evidently caused Hess's injuries. This is not the case of a policymaker's issuing a broad directive which only remotely governed a separate official's conduct. The policymaker's conduct and the injuring conduct are one and the same here.

The Village of Bethel disagrees on this point. It argues that Teague was not acting in his "capacity as a final decision-maker." (Doc. 34, #559 (citing *Wooten v.*

*Logan*, 92 F. App'x 143, 146–47 (6th Cir. 2004))). Rather—the Village of Bethel argues—he was performing only ordinary patrol duties. (*Id.* at #560).

*Wooten v. Logan*, the case the Village cites for this argument, seems at first blush to support it. In *Wooten*, the county sheriff, using a police cruiser, conducted a traffic stop of a car occupied by a woman and a mentally handicapped girl. 92 F. App'x at 144. The sheriff had allegedly prearranged this traffic stop with the woman driver, who with the minor's mother's permission acted as her caretaker. *Id.* During the traffic stop, the two adults raped the girl. *Id.* The girl's mother sued the sheriff and the county for violating the girl's constitutional rights. *Id.* at 144–45. The Sixth Circuit held that the county was not liable for the sheriff's heinous acts. It stated that his actions could not "conceivably be characterized as exercising a power to set policy" and that he was not acting in a "policymaking capacity" when he raped the girl. *Id.* at 146. Rather, the sheriff "acted in the guise of a patrol officer making a traffic stop— not as a chief law enforcement officer." *Id.* at 147.

*Wooten* is no doubt correct in stating that the sheriff's actions there could not "conceivably be characterized as exercising a power to set policy." *Id.* at 146. That holding is no more than an uncontroversial application of *Pembaur*'s requirement that an official must be acting within his sphere of authority to make official policy. But *Wooten*'s language seemingly requiring the Court to determine in which capacity an officer was acting—in a sense, which hat he was wearing—is misguided. For starters, a policymaker's authorities may overlap with his ordinary official duties. Such is the case here. Teague served as the Village of Bethel's Chief of Police. In that

role, he approved incident reports and policy changes, (Teague Dep., Doc. 22, #226, 298–300), but he also worked patrol shifts, (*Id.* at #206). What the Village of Bethel's argument would require the Court to do is to determine the line where one set of duties begins and the other ends. But that is not always an easy task—nor a legally required one.

Take the facts of *Pembaur* itself as an example. In *Pembaur*, the police attempted to serve an arrest warrant on two employees of a medical center suspected of defrauding the government by receiving reimbursement from state welfare agencies for services not actually provided to patients. 475 U.S. at 471–72. When the officers attempted to enter the main portion of the facility to serve the warrants, the receptionist closed and locked the door. *Id.* at 472. Pembaur, the head of the facility, came to the front of the facility and told the police that they had no authority to be there. *Id.* The officers, rather than breaking through the door, decided to call their supervisor for further instruction. *Id.* at 472–73. The supervisor referred them to the assistant prosecutor, who instructed the deputy to "go in and get the witnesses." *Id.* at 473 (cleaned up). The officers did so, using an axe to chop down the door. *Id.* In the subsequent civil suit brought by Pembaur, the Supreme Court held the county could be held liable for the incident because the assistant prosecutor's command to "go in and get" the witnesses represented the official policy of the county, even though it was a single command in response to a single set of facts. *See id.* at 484–85.

True, in *Pembaur* an ordinary police officer paused to receive authorization from a separate person who was the policymaker. But change the factual scenario

slightly. What if the sheriff, who assumedly could make policy for the county, had attempted to serve the warrant instead? The sheriff might have come across the locked door, paused to reflect, and thought "I'm the sheriff. I have the authority. I'm going to go in and get the witnesses." In both scenarios, a final policymaker (the assistant prosecutor in *Pembaur* and the sheriff in this hypothetical) authorized the same action. But in the latter, the policymaker and the actor were one and the same. And that illustrates the difficulties a court may face in assessing what particular hat (e.g., policymaker versus patrol officer) an officer is wearing at any given moment. Fortunately, local government liability does not turn on what hat an official happens to be wearing. Rather, it turns on whether an official with "[a]uthority to make municipal policy" follows a "deliberate course of action" that falls under that official's policymaking responsibility. *Pembaur*, 475 U.S. at 483. Insofar as *Wooten* could be read as broadly limiting a local government's liability to only those situations where a policymaker is performing *unique* policymaking duties (thereby excluding municipal liability when the municipal policymaker in a sense announces the policy by personally implementing it), the Court declines to adopt that reading. *S.J. v. Hamilton Cnty.*, 374 F.3d 416, 423 n.5 (6th Cir. 2004) (reiterating that unpublished decisions of the Sixth Circuit are nonbinding).

In any event, even assuming the Court were to apply *Wooten*'s capacity-based holding to this case, the Village of Bethel's argument still fails. First, as a matter of state law, it is the *Chief of Police*, not ordinary officers, who is tasked with keeping the peace, suppressing riots, and arresting persons in the act of committing an

offense. Ohio Rev. Code § 737.19. So to the extent that the Court must determine whether Teague was acting as an ordinary patrol officer or acting as the Chief of Police, the Court finds that legally he had to be acting as the latter. Second, even if Teague were acting as an ordinary patrol officer when he arrested Hess, he ratified his own decision later when he approved his own incident report, (Doc. 22, #298–99; Doc. 22-1, #366)—that ratification separately gives rise to potential municipal liability. *Praprotnik*, 485 U.S. at 127 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.").

Viewing the facts in the light most favorable to Hess, the Court holds that Teague, the chief policymaker on law enforcement arrest authority in the Village of Bethel, acted on behalf of the Village when he announced he did not need a warrant and then entered Hess's residence to arrest her. And this is further substantiated by Teague's later ratification of his own actions by approving his own incident report. Accordingly, the Village of Bethel is not entitled to summary judgment on Hess's Fourth Amendment unlawful entry claim. So the Court denies the Village's motion to the extent it seeks entry of judgment in its favor on that claim. But because the Court holds that Hess does not have a viable standalone excessive force claim, it grants the Village of Bethel's motion as to that claim. *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) ("There can be no *Monell* municipal liability under § 1983 unless there is an underlying unconstitutional act.").

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Teague's Motion for Summary Judgment (Doc. 25) and **GRANTS IN PART** and **DENIES IN PART** the Village of Bethel's Motion for Summary Judgment (Doc. 24). The Court construes Hess's Motion to Strike (Doc. 30) as an objection to the admission of the affidavit and report of Scott Hughes (Doc. 23-1). The Court **SUSTAINS** Hess's objection (Doc. 30) and **STRIKES** the affidavit and report (Doc. 23-1). (*See* supra n.1). The Court **DISMISSES** the individual-capacity claims against Teague. And finally the Court **DISMISSES** the excessive-force claim in its entirety.

**SO ORDERED.**

July 8, 2024
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

36